Filed 8/9/22  P. v. Cook CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>EARL STANLEY COOK, JR.,<br><br>        Defendant and Appellant. | A161600<br><br>(San Mateo County Super. Ct. No. 20–SF–001729–A) |

A jury found defendant Earl Stanley Cook, Jr. (defendant) guilty of elder abuse, making criminal threats, and dissuading a witness.  The victim in all three offenses was defendant's father, Earl Cook, Sr. (Cook, Sr.), and he refused to testify against his son at trial.

Defendant raises two evidentiary claims on appeal.  He contends the trial court erred in admitting evidence of (1) Cook, Sr.'s statements to the police that defendant threatened to kill him and (2) a text message Cook, Sr. received after defendant was arrested.

Finding no error, we affirm.

1

# FACTUAL AND PROCEDURAL BACKGROUND

*January 29 Incident*

In 2020, Karina Fuller and her mother lived in a two-story apartment building on Newell Road in East Palo Alto.[1]  The building has an indoor lobby with a staircase to the second floor.  Cook, Sr. lived upstairs from the Fullers, and his balcony was directly above theirs.

On the evening of January 29, Karina and her mother were in their apartment when they heard a sudden commotion upstairs.  There was loud banging and yelling.  Karina heard Cook, Sr. yell for help, and she called 911.  While she was on the phone, Karina heard a loud thud and "saw a dark figure" on the balcony of their apartment.  Karina's mother also heard a "boom" and saw that a "guy jumped onto our balcony."  She thought she saw a gun in the man's hand, and she became very scared.  Karina grabbed her mother, and they hid in a bedroom.  Karina told the 911 operator that someone had jumped on her balcony and she was barricading herself in her room.  Her mother saw the person who jumped onto their balcony walk into their apartment from the balcony.  Karina testified that, from her bedroom, she "heard him walking out and the [front] door closed," suggesting that the person who jumped on the balcony walked through the Fullers' apartment and left through their front door.

The same evening, Mosese Vainuku, a first-floor resident of the apartment building, heard a noise and then heard someone call for help from inside the building.  Vainuku opened his front door and saw a person coming down the stairs "all covered in blood."  The man was stumbling, and he kept mumbling, "My son did this."  Vainuku told the man to sit down, and he went

---

[1] All dates are in 2020.

back into his apartment to get his phone to call 911 and a t-shirt to wipe the blood off the man's face.

*Police Response*

East Palo Alto Police Officer Bobby Magami and about five other officers, including Officer Joseph Klein, were dispatched to the apartment building around 6:30 p.m. The original report from dispatch was of a prowler, and as Magami was coordinating a response, a report of a possible stabbing came through.

Magami found Cook, Sr. in the lobby of the building, his head, face, and neck covered in blood, and his shirt bloodstained. Cook, Sr.'s face was swollen, and he seemed distraught and was gasping for air. Magami's initial concerns were the victim's welfare and health and identifying and apprehending a suspect.

Cook, Sr. told Magami he was assaulted by his son and identified defendant by name. He said, "He was on top of me and . . . he just beat me up." Cook, Sr. was concerned about retrieving his wallet, phone, and keys from his apartment; he said defendant had keys to his apartment and he had "been trying to take my car." Cook, Sr. told Magami that he was "fighting for [his] life" and that defendant threatened to kill him. Cook, Sr. reported, ". . . he said, 'I'm going to kill you.' He would have I think."

Magami asked for a description of the perpetrator and where he went. Cook, Sr. said his son was 39 years old, six feet two inches tall and about 200 pounds, wearing gray sweats. He indicated defendant was headed toward 7-Eleven on Newell by foot. Magami asked if his son had a weapon, and Cook, Sr. said no. Magami radioed in the description of the suspect and his direction of travel.

3

After learning that the suspect was wearing sweatpants and had walked towards 7-Eleven, Officer Klein walked down Newell Road to search for the suspect. Klein found defendant within four minutes. Defendant was wearing gray sweatpants, it appeared there was dried blood on his pants and shirt, and his hands were swollen and purple and appeared to be covered in dried blood. Defendant initially said his name was Calvin. Defendant swayed and smelled of alcohol, and Klein arrested him. Klein returned to the apartment building and showed Cook, Sr. a photograph of defendant; Cook, Sr. confirmed it was his son and was the person who had beaten him.

Cook, Sr. was taken to the hospital by ambulance. He told the emergency doctor he had been punched in the face multiple times by his son who was intoxicated. The doctor noted that Cook, Sr. had swelling of the upper and lower lips, swelling around the right ear, and an abrasion of the left elbow, and he required five stitches for a right eyebrow laceration. Cook, Sr. also had a minimally displaced fracture of the left index finger.

*Text Message Received by the Victim*

Two days later, Officer Magami conducted a follow-up visit to Cook, Sr.'s home. Cook, Sr. showed Magami a text message he received on his cell phone at approximately 8:00 p.m. on January 30. The text had come from a number stored under the name "Tenise" on Cook, Sr.'s phone.

The text read: "I know your son can be a handful at times. That's still your son and he has some demons he is dealing with. We all do. I just ask that you don't press charges to make his situation worse. If he gets out of this, I will make sure that he doesn't come back to your house or that you will ever have to deal with going through something like this again with him. That's your son. He loves you and you love him at the end of the day."

4

*Trial*

The San Mateo District Attorney charged defendant with elder abuse (Pen. Code, § 368, subd. (b)(1); count 1), making criminal threats (*id.*, § 422, subd. (a); count 2), and dissuading a witness (*id.*, § 136.1, subd. (b)(2); count 3). It was alleged defendant had prior strike convictions (*id.*, §§ 667, subds. (b)–(i); 1170.12) and he committed the current offenses while on felony probation (*id.*, § 1203, subd. (k)).

At trial, Cook, Sr. refused to testify against his son. The jury heard from Cook, Sr.'s neighbors (the Fullers and Vainuku), the emergency doctor who treated Cook, Sr., and Officers Magami and Klein. The jury also viewed recordings taken by the officers' respective body-worn cameras showing Magami's interactions with Cook, Sr. on the evening of January 29th and Klein's arrest of defendant.

In addition, the prosecution called a detective with the San Mateo Sheriff's Office who monitors inmate calls at the county jail. He testified about a recorded jail call between defendant and a woman whose phone number was registered with the jail telephone system under the name Tenise Cook. The recorded call, which took place around 7:30 p.m. on January 30, was played for the jury. In the call, defendant said to the woman, "Tell him to go to the DA's office and not press any charges. You can keep the restraining order if you want to. I don't care about that. I'm not trying to be around him, but tell him not to press any charges."[2]

---

[2] The transcript of the call is not part of the appellate record, and the detective did not testify about what was said during the recorded jail call. The quote and the time of the call are taken from the prosecutor's closing argument, during which she played the jail call again and recited what defendant said. In respondent's appellate brief, the Attorney General quotes the prosecutor's recitation of defendant's statement made during the jail call,

The jury found defendant guilty as charged. In a bifurcated proceeding, the trial court found true enhancement allegations that defendant had a prior strike conviction and was on felony probation when he committed the offenses. Defendant was sentenced to five years, four months in prison.

## DISCUSSION

A.  *Admission of the Victim's Out-of-Court Statements that Defendant Threatened to Kill Him*

Defendant contends the trial court erred in admitting Cook, Sr.'s statements that defendant threatened to kill him.[3] He claims evidence of Cook, Sr.'s statements about what defendant said to him constitutes inadmissible "double hearsay." He argues that, as a matter of state evidentiary law, Cook, Sr.'s statements were not spontaneous or a description of physical injury and, as a constitutional matter, they were testimonial and therefore their admission violated his Sixth Amendment right to confront witnesses. We are not persuaded.

   1.  Background

In competing motions in limine, defendant sought to exclude evidence of Cook, Sr.'s out-of-court statements on the ground such statements would violate his Sixth Amendment right to confront the witness, and the prosecution sought to admit Cook, Sr.'s statements to law enforcement under the hearsay exceptions for spontaneous statements (Evid. Code,[4] § 1240) and

---

and defendant does not object or dispute the accuracy of the statement in his reply.

[3] Defendant implicitly concedes that evidence of Cook, Sr.'s statements describing the attack and identifying defendant as the perpetrator was properly admitted.

[4] Further undesignated statutory references are to the Evidence Code.

6

descriptions of infliction or threat of physical injury made by an unavailable witness (§ 1370). The prosecution argued the Sixth Amendment did not apply because Cook, Sr.'s statements to law enforcement were not testimonial.

Cook, Sr.'s unavailability as a witness was established in a hearing outside the presence of the jury. Cook, Sr. testified he was 65 years old, identified defendant as his son, and stated he loved his son and no one "wants their child to get in trouble." However, when asked by the prosecutor whether he knew someone named Tenise, he refused to testify. The trial court found Cook, Sr. in contempt of court.

The trial court ruled Cook, Sr.'s statements to the police were admissible under section 1240 because Cook, Sr. "was clearly still under the immediate aftereffects" of the attack. It found the statements were not testimonial under the Sixth Amendment, observing the officers "were dealing with an ongoing emergency": they had "an injured victim who had been bleeding profusely . . . and is covered in blood," they were trying to determine whether the suspect was armed, "they [we]re trying to locate the suspect who fled the scene," and "there [wa]s a concern for continued victimization of the complaining witness in this case." The court also found Cook, Sr.'s statements admissible under section 1370 because they appeared "to narrate the infliction of physical injury upon the declarant" and Cook, Sr.'s refusal to testify rendered him unavailable.

2. Analysis

Hearsay evidence "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200, subd. (a).) Hearsay evidence is generally

7

inadmissible, but there are many exceptions to this rule. (*People v. Grimes* (2016) 1 Cal.5th 698, 710.)

> a. *Evidence of Defendant's Threat to Kill the Victim Was Not Inadmissible Hearsay*

Evidence that defendant said to Cook, Sr. that he was going to kill him was not hearsay because it was not offered to prove the truth of what defendant said; it was offered to show that defendant made the threat. The offense of making criminal threats does not require that the defendant actually intend to harm the victim (Pen. Code, § 422, subd. (a)), and evidence in this case that defendant said he was going to kill Cook, Sr. obviously was not offered to establish the truth of that statement since defendant, fortunately, did not go on to kill Cook, Sr. Moreover, as the Attorney General points out, even if evidence of defendant's threat was deemed hearsay evidence, it would be admissible under section 1220, the exception to the hearsay rule for admissions by a party. In short, the admission of evidence of defendant's out-of-court threat to Cook, Sr. did not violate the rule against hearsay evidence.

> b. *Evidence of the Victim's Statements Was Admissible Under Sections 1240 and 1370*

In contrast to defendant's statement threatening to kill, Cook, Sr.'s own statements that defendant threatened him clearly were offered to prove the truth of the matters stated. Evidence of Cook, Sr.'s statement was therefore admissible only if an exception to the hearsay rule applied.

As we have described, the trial court admitted evidence of Cook, Sr.'s statements to law enforcement under the hearsay exceptions for (1) spontaneous statements and (2) descriptions of infliction or threat of physical injury made by an unavailable witness. We review the court's rulings for abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983,

8

1007–1008 [evidentiary ruling " 'that turns on the hearsay nature of the evidence in question' " is reviewed for abuse of discretion].)

Section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement" "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant" and "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception."

" 'Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact.' " (*People v. Mataele* (July 21, 2022, S138052) __ Cal.5th __ [2022 WL 2840536, at \*19].) Our high court has explained, " 'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker.' [Citations.] 'A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was "time to contrive and misrepresent[,]" ' such as 'the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication.' " (*Ibid.*)

Defendant argues Cook, Sr.'s statements about defendant's threat were not spontaneous because they occurred in the latter part of his interaction with Officer Magami. Defendant asserts that, by the point Cook, Sr. spoke of defendant's threat, Magami was asking detailed questions, which "deprived Mr. Cook, Sr.'s response of the requisite spontaneity." But " '[n]either lapse

9

of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.'*" (*People v. Poggi* (1988) 45 Cal.3d 306, 319.)

Here, the trial court viewed the body camera footage of Magami's interaction with Cook, Sr. before ruling, and it determined that Cook, Sr. "was clearly still under the immediate aftereffects" of the attack when he made his statements. Based on its review of the body camera recording, the court observed that Cook, Sr. "at times was unfocused, and that appeared to be a direct result of whatever trauma he had just experienced" and that he sometimes had difficulty focusing on the officers' questions. Thus, the court properly considered whether Cook, Sr. " 'was still under the stress and excitement of the startling event' " and before he had time to deliberate or fabricate. (*People v. Mataele, supra,* 2022 WL 2840536, at \*19.) The body camera video is not part of the appellate record, but the transcript of the recording supports the court's finding. Cook, Sr. did not always respond to the officers' questions, and it seems he simply blurted out that defendant threatened him. Magami asked how defendant got out of his apartment, and Cook, Sr. responded, "Well I was trying to get out of the door. He was trying to hold me inside and he—he said that he was . . ." "He said that he was going to try—try to kill me." There was no other question pending when Cook, Sr. stated, ". . . he said, 'I'm going to kill you.' He would have I think."

On this record, it was not an abuse of discretion for the trial court to find Cook, Sr.'s statements that defendant threatened to kill him were made spontaneously while under the stress of excitement caused by the traumatic

10

event. Accordingly, we find no error in the court's ruling that evidence of the statements qualified for the hearsay exception of section 1240.

We also find no abuse of discretion in the court's ruling that Cook, Sr.'s statements were admissible under the hearsay exception for threats of infliction of injury. Section 1370 provides a hearsay exception where (1) "[t]he statement purports to narrate, describe, or explain the infliction or *threat of physical injury* upon the declarant," (2) the declarant is unavailable, (3) "[t]he statement was made at or near the time of the infliction or threat of physical injury," (4) "[t]he statement was made under circumstances that would indicate its trustworthiness," and (5) "[t]he statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official." (§ 1370, subd. (a), italics added.)

Defendant asserts the requirements of section 1370 were not met because Cook, Sr.'s statements that defendant threatened to kill him did not describe a physical injury and lacked trustworthiness.[5] Defendant simply ignores the fact that section 1370 covers descriptions of "threat of physical injury," as well as infliction of injury. It goes without saying that defendant's statement that he was going to kill Cook, Sr. qualifies as a threat of physical injury under section 1370, subdivision (a)(1).

Defendant argues Cook, Sr.'s statements lack trustworthiness because they were made to officers as part of their investigation of potential charges that could be brought against defendant. Defendant fails to demonstrate, however, that the trial court abused its discretion in reaching a contrary conclusion. The court found Cook, Sr. "was clearly still under the immediate

---

[5] Defendant does not dispute that Cook, Sr. was unavailable as a witness, that the statements at issue were made near the time of the threat, and that the statements were made to a law enforcement official.

11

aftereffects which gives reason to believe that his comments had that additional air of trustworthiness." It found Cook, Sr. was not contemplating litigation when he made the statements, there was "no evidence to suggest any bias or motive for fabricating the statements," and his statements generally were corroborated by the extent of his injuries and the blood found on defendant's hands and clothing.[6] The court's reasoning is supported by the record, and we see no abuse of discretion.

    c.    *The Victim's Statements Were Not Testimonial Under the Sixth Amendment*

Next, defendant contends admission of Cook, Sr.'s statements violated the Sixth Amendment because the statements were testimonial.

The Sixth Amendment "prohibits the introduction of *testimonial* statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " (*Ohio v. Clark* (2015) 576 U.S. 237, 243, italics added.) " 'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the

---

[6] Section 1370, subdivision (b), states that "circumstances relevant to the issue of trustworthiness include, but are not limited to, the following: [¶] (1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested. [¶] (2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive. [¶] (3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section."

interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " (*Id.* at p. 244.)

We independently review whether a statement is testimonial. (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 825 (*Ramirez Ruiz*)

In *Ramirez Ruiz*, *supra*, 56 Cal.App.5th at pp. 822–825, our court recently reviewed the case law on determining whether a statement is testimonial for purposes of Sixth Amendment analysis. We gleaned the following guidance from our high court: "When police are involved, the court has instructed that we must evaluate the circumstances and the statements and actions of the parties to determine 'the primary purpose of both officer and declarant' based objectively on ' "the purpose that reasonable participants would have had." ' . . . [W]e 'should consider whether an " 'ongoing emergency' " exists, or appears to exist, when the statement was made,' even 'if hindsight reveals that an emergency did not, in fact, exist.' [Citation.] 'Whether an ongoing emergency exists is a "highly context-dependent inquiry" ' that may take into account whether the victim, first responders, or the public remain at risk. [Citation.] Also, 'regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations.' " (*Id.* at pp. 824–825.)

In *Michigan v. Bryant* (2011) 562 U.S. 344, 376, for example, the police responded to a call that a man had been shot, and the United States Supreme Court held that the shooting victim's statement identifying the shooter was not testimonial. (*Id.* at pp. 376, 348–349.) The court explained, "The questions [the police] asked—'what had happened, who had shot him, and where the shooting had occurred,' [citation]—were the exact type of questions necessary to allow the police to ' "assess the situation, the threat to their own

safety, and possible danger to the potential victim" ' and to the public, [citations], including to allow them to ascertain 'whether they would be encountering a violent felon,' [citation]. In other words, they solicited the information necessary to enable them 'to meet an ongoing emergency.' " (*Id.* at pp. 375–376, fn. omitted.)

In this case, defendant argues there was no ongoing emergency when Cook, Sr. told the police that defendant threatened him because defendant "had been arrested, the scene was secured, and no one else was at risk." But the evidence shows a more chaotic and evolving situation where it appears the police were still responding to an ongoing emergency when Cook, Sr. made the statements at issue.

The initial report was of a prowler, and the Fullers reported that someone had jumped on their balcony. When Magami arrived, he found Cook, Sr. covered in blood, "distraught," and "gasping for air." Magami's concerns were Cook, Sr.'s welfare and health and identifying and apprehending a suspect. Throughout the interaction, Cook, Sr. repeatedly asked about his keys and wallet, and he stated his fear that his son would return and steal his car. Right before Cook, Sr. said defendant threatened to kill him, Magami asked, "How did your son get out of the apartment?" a question that may have been directed at assessing the risk of the perpetrator returning the same way. And, contrary to defendant's assertion, it is not clear from the transcript of the body camera recording that he had been apprehended at the time Cook, Sr. made the statements at issue, or if defendant had been apprehended, that the police were certain they had the right person.

Another circumstance objectively indicating that the primary purpose of Magami's interaction with Cook, Sr. was to respond to an ongoing

14

emergency was the disorganized fashion in which the questioning occurred. (See *Michigan v. Bryant, supra,* 562 U.S. at p. 366 [victim's statements were not testimonial where "the questioning . . . occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion"]; *Ohio v. Clark, supra,* 576 U.S. at p. 245 ["A 'formal station-house interrogation' . . . is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused"].) Magami was not interviewing Cook, Sr. at the police station or in the privacy of the victim's apartment; rather, the officer spoke to Cook, Sr. in the lobby of his apartment building while he was still "dazed" from the attack and Magami was coordinating a response. The transcript of the recording shows that many different individuals were asking questions and speaking in addition to Magami and Cook, Sr., and Magami was often in radio communication with other officers, relaying information as he learned it.

Based on all these circumstances, we conclude Cook, Sr.'s statement was nontestimonial because it was made during police questioning aimed at addressing an ongoing emergency.[7] Consequently, there was no error in the

---

[7] We recognize that early in the interaction, Magami said to Cook, Sr., "So let me ask you something very important. There's cops out there looking for him right now." "When the cops find him what do you want done? You want obviously—you want him to go to jail, or . . ." (Cook, Sr. responded, "Uh," and then said he needed his phone; he never answered Magami's question.) But we agree with the Attorney General that this does not affect our analysis. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had . . . ." (*Michigan v. Bryant, supra,* 562 U.S. at p. 360.) On this record, the purpose of a reasonable officer responding to the scene and interacting with the victim would have been assessing the danger of the situation to Cook, Sr., the officers and the public,

15

trial court admitting evidence of Cook, Sr.'s statement under sections 1240 and 1370.

B.    *Admission of Text Message*

Defendant also contends the trial court erred in admitting evidence of a text message Cook, Sr. received from "Tenise" on January 30 urging him not to press charges.  Defendant argues the text was not properly authenticated and was impermissible hearsay.  We disagree.

1.    The Text Message Was Sufficiently Authenticated

"Authentication of a writing, including a photograph, is required before it may be admitted in evidence.  (§§ 250, 1401.)  Authentication is to be determined by the trial court as a preliminary fact (§ 403, subd. (a)(3)) and is statutorily defined as 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' (§ 1400)."  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)  The proponent of a writing meets her burden when there is "sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered.  [Citation.]  Essentially, what is necessary is a prima facie case.  'As long as the evidence would support a finding of authenticity, the writing is admissible.  The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' "  (*Id*. at p. 267.)

We review the trial court's finding that there is sufficient evidence to support a finding of authenticity for abuse of discretion.  (See *People v. Goldsmith*, *supra*, 59 Cal.4th at p. 266; *People v. Landry* (2016) 2 Cal.5th 52,

---

attempting to obtain information relevant to capturing the perpetrator, and providing Cook, Sr. medical assistance.

87–88 [reviewing for abuse of discretion trial court's ruling that letters purportedly written by the defendant in prison were sufficiently authenticated].)

Defendant claims there was no circumstantial evidence that the text message Cook, Sr. received was sent by Tenise or even sent from her cell phone. At a pretrial hearing on the admissibility of evidence of the text message, defense counsel raised a similar issue, arguing lack of foundation. He asked, "How do we know who this person is? The text message, the phone numbers, the dates, the times, all of that. Or that all just goes to its weight?"

In response, the trial court explained why there was sufficient foundation to admit the text: The prosecution would present evidence that defendant made a phone call "to somebody named Tenise on January 30th," in which "defendant gives instructions to Tenise to tell him to go to the DA and not to press charges, 'him' being the complaining witness; that there is evidence that's going to come in that an officer will testify that he met with the complaining witness who showed him the complaining witness'[s] phone. On the phone was a text message from Tenise. It's a very unusual name; that that text message shown to the officer was—it was one day after the phone call was made,[8] two days after the incident, and that the officer took a picture of Mr. Cook, Senior's phone, captured a screenshot with the text message from Tenise. That is a sufficient foundation."

---

[8] The text message itself had a time and date stamp indicating it was sent within about 30 minutes of the jail call between defendant and Tenise. The trial court, however, was making the point that even without considering the time and date shown on the text, Magami's testimony that he was shown the text on January 31 would establish that the text was sent to Cook, Sr. close in time (within a day) to the jail call between defendant and Tenise.

17

We see no abuse of discretion in the trial court's ruling. The prosecution presented evidence that, while he was in jail, defendant had "[m]any, many calls" with a woman whose telephone number was registered under the name "Tenise Cook," that in a jail call on January 30 around 7:30 p.m., defendant told Tenise (or at least the woman answering to Tenise's phone number) to tell him "*not to press any charges*," and that, a day after this jail call, Cook, Sr. showed Officer Magami a text message he received from a number stored on his cell phone under the name "Tenise" that read in relevant part, "I just ask that you *don't press charges* to make his situation worse." (Italics added.)

This was sufficient circumstantial evidence that the text message Cook, Sr. showed Magami was what the prosecution purported it to be. In other words, a reasonable trier of fact could have inferred from the evidence that a woman known to defendant and Cook, Sr. as Tenise sent the text message Cook, Sr. showed Magami, and that defendant had previously instructed the same woman to tell Cook, Sr. not to press charges. Accordingly, defendant's claim that the text message was not properly authenticated fails.

2. <u>The Text Message Was Not Admitted for a Hearsay Purpose</u>

Finally, defendant argues the text message constituted impermissible hearsay.

The trial court explained why the text message was not being admitted for a hearsay purpose: "[T]he hearsay rule would preclude [the message] from being admitted for the truth of what it asserts. [¶] The truth of what it asserts is that the defendant could be a handful. . . . The truth of this message, if you are to believe it, is that the defendant has some demons he is dealing with. [¶] . . . The truth of this declaration is Tenise declaring that she will make sure that the defendant doesn't come back to the complaining

18

witness'[s] house, that she will make sure that the complaining witness never has to deal with or go through an event like this again. The truth of this declaration is that the defendant loves the complaining witness." On the other hand, the court observed, Tenise asking Cook, Sr. "that he not press charges is not a hearsay statement. That is a question . . . ."

The trial court's hearsay analysis is correct. The statement, "I just ask that you don't press charges . . ." was not offered to prove the truth of any matter stated. The fact that Tenise texted "I just ask that you don't press charges" is established by the evidence of the text message itself, but there is no past fact that the jury was being asked to find based on those words. The fact that Tenise sent the text message to Cook, Sr. at the behest of defendant could be inferred from the jail call in which defendant told her to tell "him" not to press charges. But, again, the words of the text were not offered for a hearsay purpose. Defendant's claim that the text message was improper hearsay fails.

## DISPOSITION

The judgment is affirmed.

_____

Miller, J.

WE CONCUR:


_____

Richman, Acting P.J.


_____

Stewart, J.


A161600, *People v. Cook*

20